Filed 3/18/26  P. v. Saucer CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTOINE TYRONE SAUCER,<br><br>        Defendant and Appellant. | A167793<br><br>(Contra Costa County<br>Super. Ct. No. 05002014454) |

A jury convicted Antoine Tyrone Saucer of two first-degree special-circumstance murders, gang conspiracy, and dissuading a witness after he shot and killed one victim and later aided and abetted in killing a second victim who Saucer believed was a witness to the first murder.  Between Saucer's trial and sentencing, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) became effective, resulting in the trial court dismissing the gang conspiracy charge and the related special circumstances and enhancements but leaving the remaining convictions and findings intact.

On appeal, Saucer contends the trial court erroneously admitted a witness's prior statements to the police, denied his motion for a new trial with respect to the remaining convictions, and limited the jury's consideration of his voluntary intoxication.  Saucer also contends insufficient evidence supports his conviction for the second murder, and the court

1

prejudicially erred by admitting his statements to the police because they were involuntary.

Agreeing with the parties that there is a clerical error in the abstract of judgment, we direct the clerk of the superior court to correct the abstract of judgment as noted herein.  We affirm the judgment.

## BACKGROUND

## I.

## Charges

On October 14, 2020, the Contra Costa County District Attorney filed an information charging Saucer with the murders of Carl Roberts and Burt Mascarenas (Pen. Code, § 187, subd. (a);[1] counts 1 and 4), criminal street gang conspiracy to commit murder (§ 182.5; count 2), and dissuading a witness (Roberts) by force or threat (§ 136.1, subd. (c)(1); count 3).[2]  As to both murders, the information also alleged the multiple-murder special circumstance (§ 190.2, subd. (a)(3)).  As to the Roberts murder, the information also alleged the gang-murder special circumstance (§ 190.2, subd. (a)(22)) and the gang-based firearm enhancement (§ 12022.53, subds. (d) & (e)).  As to the Mascarenas murder, the information alleged that Saucer personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  And regarding the dissuading a witness count, the

---

[1] All further statutory references are to the Penal code unless otherwise stated.

[2] The information also alleged attempted second degree robbery (§§ 211, 664; count 5), but following the first day of testimony, the trial court severed the attempted robbery count from the other counts, and at sentencing, the court dismissed this count at the People's request.

2

information alleged that Saucer committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)).

**II.**

**Evidence at Trial**

Trial took place over approximately 25 days in 2021.  We describe the testimony relevant to the issues on appeal.

## A. 2006 Murder of Burt Mascarenas

### 1. Crime Scene

In the afternoon of May 11, 2006, police responded to a shooting on Harbour Way in Richmond.  The victim—Burt Mascarenas—was lying on the sidewalk by an "iron entrance" to a property on Harbour Way.  Nearby, officers found 15 nine-millimeter casings, "deformed bullets, lead core bits," and "[s]cattered" bullet fragments.

### 2. Eyewitness Testimony

The jury heard testimony from three eyewitnesses to the shooting.[3]

#### a. J.C.

Prior to trial, J.C. spoke with investigating officers, Richmond Police Detectives Nicole Abetkov and Darrell Graham.  On May 16, 2006, J.C., whose nicknames included "T.", told the detectives he had been "good friends" with Mascarenas and witnessed the shooting.  As will be discussed in more detail *post*, at trial, J.C. testified that due to a serious motorcycle accident, he was unable to recollect anything about the Mascarenas shooting.  Over defense objection, the trial court admitted J.C.'s prior statements given to the police.  The interviewing detectives relayed the substance of J.C.'s prior

---

[3] We refer to the testifying witnesses and their associated nicknames by using initials for privacy purposes.  (See Cal. Rules of Court, rule 8.90(b)(10).)

statements, as follows: About an hour before the shooting, J.C., Mascarenas, and others were "all hanging out together around the corner from the location of the shooting." At some point, Mascarenas left, and a person nicknamed "KG"[4] approached the remaining group, warning them that "something was going to happen around the corner and that if they didn't want to be a part of it, to just stay away."

When Mascarenas returned, J.C. told him what KG had said, and the group "stay[ed] away from that area for" about an hour. Eventually, J.C. and Mascarenas drove around the corner to the location where the shooting later occurred. J.C. sat on a porch next to the house where the shooting took place. Other people were at the scene, including KG, "Snoop", "Darv", and C.B. J.C. said there was a "conversation between [Mascarenas] and KG," during which J.C. saw someone nicknamed "Mossy" approach them. J.C. "heard loud arguing between KG and [Mascarenas]." J.C. also heard Mossy "start talking loud[ly]" and "cursing" "just before the shooting." Mossy then "pulled out [a] gun and began to fire at [Mascarenas]," who attempted "to dodge the bullets." When Mascarenas "fell to the ground," Mossy "stood over [him] and continued to fire the gun," "unloading the gun into" him. J.C. was "[a]pproximately 6 feet" away from the shooting and estimated Mossy fired "around 17" gunshots. According to J.C., the gun was "[p]ossibly" "9-millimeter," "[n]ickel plated," and "silver or stainless steel."

J.C. described Mossy as wearing a red Cubs "baseball hat with the letter 'C.'" J.C. said when the shooting started, he was "behind [a] pillar on the porch" and "it didn't seem . . . the suspects knew he was there."

J.C.'s descriptions of the scene were consistent with Detective Abetkov's personal observations of the scene. During J.C.'s interview with

---

[4] "KG" was later identified as Kendrick Woods.

4

police, Detective Abetkov created a sketch of the scene, which J.C. marked with the locations of the individuals present during the shooting.

The officers showed J.C. two photographic lineups. In the first, J.C. "[i]mmediately" identified Saucer as being Mossy—the shooter. In the second, J.C. "immediately" identified KG. After "referencing KG" and having the photo lineups "in front of him," J.C. "mention[ed] that his cousin" gave "him information about" individuals' names. Specifically, J.C. said his cousin gave him Saucer's "government name"—Antoine—whereas J.C. knew Saucer as "Mossy."

### b. A.Y.

Detective Graham testified that on November 15, 2006, it came to his attention that A.Y.—who was jailed on outstanding warrants—wanted to speak with him. Graham interviewed A.Y., who reported being directly across the street during Mascarenas's murder. A.Y. said she knew Saucer "for a long time" both as "Mossy" and by his true name. When Graham showed A.Y. Saucer's picture, she "immediately recognize[d] him as and identif[ied] him as the Mossy of which she was speaking."

A.Y. described seeing Mascarenas get out of a truck and walk toward the crime scene "shortly before the shooting." Saucer "walk[ed] past her as he approached the area where the shooting ultimately happened." A.Y. told Detective Graham that "people [were] sort of congregated in the area in front of [a house on] Harbour" Way until they "scatter[ed]" and moved away from the gate at that address. A.Y. said that KG, Mascarenas, Darvin, J.C. and Snoop were at the gate. KG was A.Y.'s uncle. A.Y. did not see "any tension" between Saucer and Mascarenas. "[T]hey were talking amongst themselves," and she did not "think that anything was about to happen."

5

At some point, however, A.Y. saw Saucer shoot Mascarenas using a "silver [and black] handgun of some sort." Although A.Y. said she ran into a house after the fifth gunshot, she also said that Saucer fired 15 rounds and continued to fire when Mascarenas was on the ground. A.Y. "specifically described seeing [Saucer] standing over [Mascarenas] and shooting" him. Saucer—who wore a baseball hat that may have been blue and bore the letter "C"—then fled "[t]hrough the apartment complex they were in front of." When Detective Graham expressed concern that A.Y. was simply repeating things she may have heard, A.Y. confirmed she was present at the time of the killing. Although A.Y. was in custody at the time of the interview, she did not "try to bargain with [Graham] and ask for consideration in exchange for helping with this investigation," nor did Graham "offer anything of that sort to her."

At trial, A.Y. walked back important aspects of her original statement. She testified she knew Mascarenas "[t]hrough the streets," they were not friends, but they "got along." When asked by the prosecutor how she felt about testifying, A.Y. stated, "I am a little eerie about it because I don't supposed to be here." She then denied being present during Mascarenas's killing. Rather, A.Y. testified she was inside her aunt's house, which was about "a thousand feet away" and "directly across the street" from the crime scene. A.Y. denied hearing any gunshots and said she came outside after the shooting when she heard sirens. At that point, she saw Mascarenas's body on the ground.

A.Y. identified Saucer as "Mossy," someone she had known "[a]ll [her] life" because they "have a family connection." A.Y. denied seeing Saucer walk down Harbour Way toward Mascarenas's location shortly before the shooting. A.Y. reported she had seen Mascarenas and Saucer together around the

6

crime scene on prior occasions but she "never saw any problems between them."

A.Y. acknowledged speaking with Detective Graham in November 2006 but could not recall what they discussed or what she told him, and she claimed that Graham had initiated the interview. Before the jury, A.Y. denied seeing Mascarenas, Saucer "and some other people by the black gate on Harbour Way," denied seeing Saucer and Mascarenas talking before the shooting, and denied seeing the shooting and its immediate aftermath. She also denied "hear[ing] people talking about what happened," discussing the incident with other people, or telling Graham about the shooting or the gun.

A.Y. explained she was at Saucer's trial because she "was served the subpoena" and "had to go" or she "would have been served with a warrant." A.Y. both denied being "concern[ed] for [her] safety" at trial and admitted she previously told Inspector Robert Pamplona that she had such concerns, which was "the truth." When asked by the prosecutor, "So you have some concerns for your safety?" A.Y. stated, "I mean, when you [are] sitting on the stand, you need to have concerns for your safety for sure." Later, A.Y. stated, "I've been knowing [Saucer] my whole life; and me being up here is a fear of my safety."

### c. C.B.

C.B. was friends with Mascarenas and was present during the 2006 shooting. C.B. did not "get a good look at what happened with" Mascarenas or "who shot."

C.B. testified that around 3:00 or 3:30 p.m. on the day of the shooting, he "was standing" there on "Darvin's" "stoop" with other people, and everyone was "[d]rinking, smoking weed, popping" "[e]cstacy pills." "[T.]" was on the porch near C.B. C.B. was sitting on a stoop, "[a]bout 10, 11 feet" away from

7

Mascarenas, who "was in the driveway of the apartment complex" "[n]ext to the house." C.B. heard Mascarenas "talking to" someone named "Mossy." At first, "[i]t didn't seem like an argument," but later C.B. "heard the arguing"; he could not see the participants. Afterwards, C.B. said a verbal altercation occurred after Mossy got "on [C.B.'s] case about some spilled beer," and Mascarenas said to Mossy, "[M]an, that's some stupid shit." KG was also present. "[S]uddenly," C.B. "heard some gunshots." C.B. did not see a gun but heard gunshots.

C.B. testified that he first heard the name "Mossy" as he ran away from the shooting. At trial, C.B. denied seeing Mossy in the courtroom. C.B. initially testified he did not see the shooter because he "wasn't paying attention to who was shooting." C.B. saw Mascarenas on the ground and "took off running" after Darvin "grabbed" him. After having his recollection refreshed, C.B. acknowledged seeing Mossy standing over Mascarenas. However, Mossy's "back was turned to" C.B. C.B. explained, "I was at his back, so I don't know who was shooting. . . . I heard the shots. I looked, seen Burt falling down, and then I was in shock. I don't remember seeing anything. I remember running." As C.B. ran away, KG told him "to shut up or [he] w[as] next."

Later that evening, C.B. spoke to the police and reviewed photo lineups. He initialed the photos of people he "said [he] might have known," trying to be truthful "[t]o the best of [his] ability." However, at trial, C.B. said he did not remember looking at photographs during the police interview, and that during the interview, his "mind was getting kind of clouded, kind of foggy" "because [he] was on drugs" and was "upset." Detective Graham testified that he had shown C.B. two photo lineups that night. In one, C.B. identified an individual who was not Saucer "as someone who hangs out" in

8

the apartment complex on Harbour Way.  In the other, C.B. identified an individual named Jasman Price as Mossy's brother.  Although C.B. referred to Mossy as the shooter, he "spent a number of minutes looking at the lineups" and did not identify anyone in the lineup featuring Saucer.  When Graham suggested to C.B. "that he was maybe afraid" to make the identification, C.B. said he did not see the shooter in the lineup.  However, C.B. also testified he did not "get a good look at the shooter's face" and "had never met Mossy" before the shooting.  He told the police they "might want to talk to" "[T.]", who "might have also seen the shooter."

When speaking to the police in 2006, C.B. initially asserted "that Mossy was the shooter," but as the interview progressed, C.B. grew "more worried about whether . . . [he] w[as] putting [his] family at risk."  He was "reluctant" to speak out of concern for his and his family's safety.  C.B. told the officer he was "afraid [he] would get murdered."  C.B. testified he also felt "the effects of . . . drugs and alcohol" and "a lot of emotion."  After the interview, C.B. "started getting threats on [his] life" and "had to go into hiding for a while." When a district attorney inspector tried to contact C.B. to give him a subpoena, C.B. told the inspector he did not "remember anything" and "didn't want to get involved."

Detective Graham also testified about C.B.'s police interview. According to Graham, C.B. called the police and wished to talk to a detective. When Graham met with C.B., C.B. told Graham that he witnessed the shooting while he was with T. and Snoop, and that KG and Mossy were suspects.  C.B.'s demeanor was "[e]motional" and "upset."

C.B. recounted a conversation among Mascarenas, Mossy, and KG during which they discussed "a previous incident in which Mossy and KG had been arrested with some firearms" and "there was some question" regarding

9

"whether they had informed on one another or someone else to get out of jail so fast." Mascarenas "teas[ed] or mock[ed] Mossy about the incident," and "Mossy appeared to take offense [at] that," "produced a firearm" from his waistband, and shot Mascarenas.

Although C.B. expressed a desire to speak to Detective Graham "he also expressed some reluctance due to concerns for his safety" "[a]nd his family's safety." As the interview progressed, C.B. became "more anxious about this situation because of whether it was putting his family in danger. "He said he couldn't even really picture the shooter's face because all he could think about and all he could see in his mind was how KG told him he was next."

When Graham followed up with C.B. the next day about his identification, C.B. said "[h]e was mostly sure" but "not a hundred percent certain." C.B. said he "had time to think about it and check on his family," but "because of the threats he was getting, he had put himself and his family into hiding."

## B. 2015 Murder of Carl Roberts

### 1. Crime Scene and Initial Investigation

In the early morning hours of August 31, 2015, officers responded to the intersection of South 35th Street and Ohio Avenue in Richmond. At the scene, they found the deceased victim—Carl Roberts—and 12 expended nine-millimeter cartridge casings.

A few days after the Roberts murder, Richmond Police conducted a traffic stop of a gray Ford sedan driven by Gerald Knightsen; the passenger was Anthony Timmons. Police seized a firearm from the glove box and it was later determined all 12 of the cartridges found at the Roberts crime scene were fired from the gun. Surveillance footage from the night of the shooting

10

showed a dark colored car stopping near Roberts. Detective Wentz testified that he believed it to be the same Ford sedan in which Timmons and Knightsen were stopped.

## 2. Police Interviews of C.P.M.[5]

<u>First Interview</u>

On October 1, 2015, Detectives Wentz and Matthew Anderson interviewed Saucer's then-girlfriend—20-year-old C.P.M. C.P.M. said she had helpful information but she did not "want [her] name on nothin' " because Saucer was "in central" and if her name "c[a]me back," then her parents would be "burying [her]" and her family would be in danger. C.P.M. declined to testify in court even if the police "[p]ut [her] up somewhere nice and away from anybody." Anderson suggested that instead of testifying, C.P.M. could "keep feeding [the police] information."

C.P.M. asked what the officers were "looking for," and Detective Wentz asked whether she was "staying with two guys . . . that were involved in something." C.P.M. answered affirmatively and identified Timmons. Timmons had called her from jail upon his arrest for the gun found during the traffic stop. At the time, C.P.M. was romantically involved with Timmons "behind [Saucer's] back." The night of the Roberts's murder, Timmons came home and told C.P.M. that around 2:00 or 3:00 a.m., while "on Ohio," "[h]e stood over a dude and shot like 14 times." "Ohio" was around the corner from Timmons's home in the Pullman Townhouses (Townhouses) residential complex.

---

[5] Portions of C.P.M.'s police interviews were admitted into evidence and played for the jury.

11

<u>Second Interview</u>

On November 24, 2015, the detectives interviewed C.P.M. again after she called Detective Wentz "and said she was having some problems." When Wentz brought C.P.M. to a police station in Martinez, C.P.M. explained that Saucer had assaulted her the previous week at their apartment in Stockton. He punched her "a few times" in the face, resulting in a swollen eye with a "blood clot." When asked whether Saucer threatened her, C.P.M. stated, "Yeah. He always threaten me." As recently as the morning of the interview and the previous night, Saucer had told C.P.M. he would "beat [her] ass" and "kill [her] and [her] baby." She had been dating Saucer for a year and was two months pregnant with his child.

When the interview switched to the Roberts murder, C.P.M. said Timmons "was the shooter." The shooting happened "right by" the Townhouses. Saucer and Timmons each told her that Saucer "was just in the car." Both men told C.P.M. "they shot the" "old man" because "the man was supposed to be tellin' on another murder." C.P.M. continued, "Now what murder, I don't know. But then again, it's supposed to be mistaken identity, was the wrong man."

Saucer told C.P.M. about Timmons's arrest with the murder weapon. During that conversation, Saucer said, " 'Babe all I did—I was just in the car. . . . I didn't shoot him.' " When C.P.M. told Saucer, " 'Well, if you was in the car, you shouldn't have nothin' to worry about,' " Saucer responded by saying "something about conspiracy."

C.P.M. further reported that Timmons told her he and Saucer "just happened to drive by and see" Roberts. When asked, "Did [Timmons] say that someone paid him to do it or anything like that?" C.P.M. responded, "No, he just told me that, um, he can't say nothin', 'cause he don't want his

12

OG to go down. Which [he was] referring [to Saucer]." According to C.P.M., Saucer was "above" Timmons, who "would look up to" Saucer.

C.P.M. reiterated that Timmons said Saucer "was in the car the whole time," and that Timmons shot the victim 14 times, including in the face, while standing "over the old man." When asked whether Timmons still talked to Saucer, C.P.M. said the two were "throwin' grudges at each other" because Timmons "got caught with the gun that did the crime" and Saucer believed Timmons would "tell on" him.

C.P.M. denied intending to get Saucer and Timmons in trouble because she was "pissed off" at them, explaining that Saucer was her baby's father. C.P.M. talked to the police because she did not "feel right havin' it over [her] shoulder [¶] . . . [¶] no more." C.P.M. denied providing the information because she needed a place to stay or wanted reward money, noting that she could have stayed in her apartment. She was "just ready to do the right thing."

C.P.M. said Saucer was "already goin' to court" for another murder and was "just playin' uncompetent [*sic*]" "like, he's crazy so he can't go to jail." Saucer was "playin' the system"; he pretended to not know the judge, the prosecutor, or what was "goin' on in court."

Towards the end of the interview, Detective Wentz informed C.P.M. that he would "make some arrangements to put [her] somewhere safe" and asked her to "stay in touch with" the police. C.P.M. stated, "I want to say so much but I'm just hella-hella scared. I'm just scared. He know my granny work at. My nephew everybody. He know everything so." When Wentz pointed out that Saucer would be jailed, C.P.M. stated, "But . . . his people out on the street. It ain't nothin' to just make a phone call or write a letter to

13

somebody." When asked, "You think his people would actually follow what he says?" C.P.M. responded, "Yeah."

At trial, Detective Wentz testified the information regarding Roberts having been shot in the face was not "publicly disseminated prior to [C.P.M.'s] interviews." Nor did Wentz reveal that information in the interview before C.P.M. mentioned it, or that the killer continued firing upon Roberts as he was on the ground.

### 3. Saucer's Statements to Police

Over defense objection—discussed in further detail *post*—the jury heard Saucer's statements made during several interviews with police.[6] Detective Wentz testified that Saucer initially denied being present when Roberts was shot. After being returned to a holding cell, Saucer asked to speak with Wentz. Saucer told Wentz that he was present when Roberts was shot; he identified Timmons as the killer. Saucer told Wentz that after he met up with Timmons outside of a liquor store, they drove to a different liquor store, where they encountered Roberts. Timmons had a conversation with Roberts about selling him some drugs. Timmons and Saucer then drove to the Pullman Apartments, where Timmons acquired a gun. Timmons and Saucer then drove to a prearranged meeting site. According to Saucer, "Timmons got out and shot the victim."

Detective Wentz testified that Saucer demonstrated how Timmons shot Roberts. Saucer "held his arm straight out, straightforward, simulating holding a gun . . . straight ahead parallel to the ground." Saucer said that Timmons continued to shoot Roberts after he had fallen to the ground.

---

[6] Portions of Saucer's police interviews were admitted into evidence and played for the jury.

Saucer told Wentz that Timmons "shot [Roberts] in the face and then stood over him and shot him more times."

### 4. Link Between The 2006 and 2015 Murders

Detective Wentz "look[ed] into the characteristics of some of the witnesses who were identified as having been witnesses in" Mascarenas's murder, viewed photographs of J.C. from 2006 and observed that J.C. resembled Roberts.

Roberts was older than J.C., but J.C. in 2006 and Roberts in 2015 had the same shaved hairstyle and mustache. The similarities between the two were not "publicly disseminated prior to [Wentz] testifying in a public court hearing in 2020."

### 5. Trial Testimony of C.P.M.

C.P.M. was 26 years old at the time of trial. She had been a prostitute and drug addict her whole life. She had a felony conviction for organized retail theft in 2021 for conduct that occurred in 2019 and a pending misdemeanor domestic violence case for punching and threatening the father of her daughter.

C.P.M. met Saucer in 2014 when she was 18 or 19; she later had a baby with him. While living with him in Stockton, C.P.M. reported Saucer to the police for assaulting her.

C.P.M. had an affair with Anthony Timmons ("Ant") during her relationship with Saucer; she didn't know if Saucer was aware of it. During her relationship with Saucer, he told her he was out of custody on a murder case. He said the person killed had been his best friend. She ended the relationship with Saucer in 2015 because he beat her. She hated Saucer and the fact that she had a child with him.

15

Also in 2015, C.P.M. went to a program to help her get cleaned up and to deal with things in her life. This led her to contact the Richmond Police Department, initially about injuries she said Saucer had inflicted on her. Eventually, she was placed in witness protection from November 2015 to May 2018. During that time, she received monthly assistance for meals, incidental expenses, and rent.

After Saucer's arrest, C.P.M. visited him at the jail several times; she was interested in getting more information before talking to the police. She did not initially recall whether, after his arrest, Saucer "tried to tell [her] what to say to the police." But C.P.M. did recall that, prior to her 2017 testimony, she received a letter from Saucer telling her, " 'Don't come to court because if [you] don't come to court, then [I] can get out.' " Later, C.P.M. acknowledged that during her jail visits with Saucer, he told her "what to say and what not to say."

Saucer told C.P.M. he had been present when Ant (Timmons) killed someone. Saucer thought the victim was the guy who had told on him regarding an earlier murder, so he asked Ant to kill him. Saucer realized at some point the victim was not the one who told on him. Saucer was afraid he would be arrested or charged with conspiracy for this murder. When she spoke to the police in 2015, she only told them about Ant's involvement in that murder because Saucer was her then-unborn baby's father, so she omitted mention of him. Also, Saucer had told her not to say anything about him to the police, and instead to implicate Ant.

During their relationship, Saucer told her he was out of custody on an earlier murder charge because he was found to be incompetent. He told her, in effect, that he was feigning incompetence. One time when she and Saucer happened to be in the Iron Triangle area of central Richmond, Saucer pointed

16

out where the earlier murder had occurred and told her " 'That's where I caught my first case at.' "  He told her he had been under the influence and "didn't mean" to kill the person.

## C. Gang Evidence

Discussed in further detail *post*, Detective Anderson testified as an expert on criminal street gangs in Richmond.  Based on his prior contacts with Saucer, Anderson believed Saucer was a Deep C gang member in 2015.

## D. Saucer's Testimony

Saucer testified that he had gone to the police station on December 1, 2015 to meet with an officer named "Mike" to whom he was providing information following a recent incident involving a gun.  The agreement was for Saucer to extract information from Timmons about a murder in return for Saucer not being "charged with a gun case."

Saucer picked up his wife's brother on the way to the station; they sat outside talking, smoking "weed," and drinking tequila.  Eventually, Mike escorted Saucer into an interrogation room with Detectives Wentz and Anderson, who asked Saucer questions.  Saucer testified that about an "hour or 45" minutes before the interview he had "popped" some ecstasy pills.

Initially, Saucer did not know what the officers were talking about.  Eventually, he realized they were asking him about Timmons.  The police questioned Saucer for "[h]ours," during which he "was crying, begging them, telling them that it wasn't [him]."  Saucer felt "[a] little bit" affected by alcohol and "[t]wo ecstasy pills."

Saucer testified that "[e]verything" he told the police was "untrue."  Saucer believed the officers represented he would "go home" if he said he saw Timmons kill the victim.  On cross-examination, after initial denials, Saucer ultimately acknowledged that Wentz "repeatedly" told him that it was the

17

prosecutor's decision regarding whether he would "get charged." Nevertheless, Saucer believed the police had power over whether he would go home.

Saucer testified that he "[r]epeatedly" "offer[ed] to lie under oath" by testifying against Timmons, but he believed he would not actually have to testify. Saucer admitted he was "willing to tell lies to avoid going to jail." He told the police to call C.P.M. because "she would say certain things to help [him] get out of jail."

After being escorted to a jail cell, Saucer asked to speak to the officers again. Saucer did not know who committed the murder but "just started saying whatever" so he could go home. Saucer "made up getting together with Timmons at" the liquor store on the night of Roberts's murder and "the fact that Timmons was driving a black car." Saucer was not aware of the surveillance footage in the officers' possession. Saucer knew Roberts "was an older, short African-American gentleman" because Timmons told him so. Saucer knew Timmons stood over Roberts and shot him multiple times because "Timmons had said he stood over something" and "everybody around the streets was saying somebody got shot a lot of times."

Regarding the Mascarenas murder, Saucer initially testified he used to buy pills from Mascarenas on Harbour Way but did not know him very well. Saucer later acknowledged he and Mascarenas "were friends." Saucer knew KG, Snoop, and Darvin but did not know J.C. or C.B. A.Y. was not part of Saucer's family, but he had "see[n] her around."

Saucer was in the area during Mascarenas's killing. Saucer "came through there, bought some pills from KG" "[a]cross the street from Darvin's house" and "went down the street" "[a]bout a block and a half up" to the home of a person he used to date. Saucer "heard shots," went outside, and saw the

18

area blocked off by police.  Saucer later found out that Mascarenas was murdered.  Saucer did not do it and did not see what happened.

When Saucer's mother told him he was a suspect, he fled to Seattle for "[a] few weeks."  Saucer was arrested in Novato in the summer of 2006. During the arrest proceedings, Saucer feared getting shot, so he "ran and jumped out the window," hitting his head.  As a result, at trial, Saucer did not remember being questioned about the killing even after being shown a transcript.

Saucer denied telling C.P.M. he shot Mascarenas and pretending to be incompetent in court.  Saucer, however, did admit he was released from custody on a finding of incompetence and subsequently arrested for the Roberts murder while "out" on the Mascarenas case.

When asked why he told the police he saw Timmons shoot Roberts, Saucer responded, "I said a lot of stuff."  Saucer told the detectives he did not understand his *Miranda* rights because he was incompetent.  (See *Miranda v. Arizona* (1966) 384 U.S. 436.)  Saucer did not remember telling the officer during an arrest on September 22, 2014, that he understood his *Miranda* rights.

Saucer denied threatening C.P.M. "to change her story," telling her not to come to court after learning what she told the police, or having other people threaten her.  Nor did he write the threatening letter to C.P.M. or have someone write it for him.  Saucer testified that he was at a friend's house in Novato when Roberts was killed.  Saucer's life was "in danger" because he "said stuff" about Timmons.

On recross-examination, Saucer reiterated that "everything" he told the police "was a lie" because he "just wanted to go home."  When asked, "And you want to go home today?" — Saucer responded, "I do."

19

### III.

### Jury Verdict and Sentencing

The jury found Saucer guilty as charged, found the murders to be in the first degree, and found true the special allegations. Before sentencing, Saucer filed a motion for a new trial arguing the changes to gang laws enacted by Assembly Bill 333 required reversal of all convictions and findings. The court granted the motion as to the gang-conspiracy conviction and the related special circumstances and enhancements, but left the remaining counts and findings intact. Thereafter, the court granted the prosecutor's motion to dismiss the gang related conviction, special circumstances, and enhancements in the interests of justice.

The court sentenced Saucer to two consecutive terms of life in prison without parole.

### DISCUSSION

### I.

### Admission of Eye-Witness's Prior Statements

Saucer contends the trial court erred in admitting J.C.'s prior statements. According to Saucer, the admission of J.C.'s police interview violated his "rights to due process and confrontation." (Capitalization and boldface omitted.) He further contends the court applied an incorrect legal standard and prejudicially erred in concluding J.C.'s statements were admissible to impeach his trial testimony.

### A. Additional Background

In November 2019, Contra Costa County District Attorney Inspector Robert Pamplona served J.C. with a subpoena in Saucer's case. The subpoena included Saucer's name but no identifying information regarding the victim. Pamplona testified that he did not tell J.C. that the subpoena

20

pertained to Mascarenas's death. Yet upon receiving the subpoena, J.C. "said that this is about his friend who got killed." Pamplona testified that J.C. did not at that time express having any issues with his memory "due to a stroke" or "having any failure of recollection in connection with this case."

In July 2020, Inspector Pamplona served J.C. with another subpoena. J.C. "said he was not coming to court" but did not "say anything about not remembering the incident that this pertained to." Pamplona explained to J.C. that his refusal to testify "could result in a warrant for his arrest." "[A] few days" after that interaction, J.C. left Pamplona a voicemail stating "he couldn't remember anything."

At trial, J.C. testified he knew Mascarenas from "the neighborhood." When asked about their relationship, J.C. asserted he did not "have that much knowledge of [his] past because of" an accident that impaired his memory. J.C. explained that in 2018, he was involved in a "dirt bike" accident during which he "suffered a spinal injury" and a stroke, resulting in a six-month hospital stay. As a result, J.C. did not remember the accident and remembered "[v]ery little" "from before the accident." He did, however, remember that Mascarenas lived on the same block as he did in Richmond, that he saw Mascarenas "in the neighborhood," and they were friends.

J.C. testified he could not remember if he was present when Mascarenas was killed. When asked "Is that because of the accident?" J.C. replied, "I guess you can say so. Yes." When asked, "You have a cousin that you are pretty close to who lived in Richmond in 2006 named Ronnekia Knight; is that correct?" J.C. answered, "Yeah. I think so," and said the name was "kind of familiar." J.C. also acknowledged that his own nickname was "[T.]"

21

J.C. was able to recall some events after his accident, such as the district attorney inspector coming to his house. J.C. testified that when Inspector Pamplona arrived in late 2019 with a subpoena, J.C. told Pamplona that he did not recall Mascarenas getting killed. J.C. did not know why he was receiving a subpoena and denied stating it "was in regards to a friend of [his] who had been killed." J.C. maintained Pamplona was the first to bring up Mascarenas's name, and that he did not even remember Mascarenas until Pamplona refreshed his recollection. J.C. testified that after his first contact with Pamplona, he left a voicemail on the prosecutor's phone saying he "didn't have any memory."

J.C. testified that when Pamplona came back with a second subpoena in the summer of 2020, J.C. again told him he had no memory of the murder. J.C. said he asked Pamplona in frustration, " 'Why do you guys keep asking me about this and coming to my house?' " J.C. denied telling Pamplona during this second visit that he was concerned for his safety.

J.C. testified that he did not remember calling the police on the day of the murder and telling an officer that he had witnessed the shooting. He did not recall giving a statement to the police a few days later, on May 16, 2006. When confronted with the diagram created during the police interview, J.C. denied that the initials apparently indicating the location of various people on the scene were in his handwriting. He did, however, acknowledge his signature and initials on the photo lineups identifying Saucer as the shooter and KG as the other party involved in the shooting. During the preliminary hearing, when asked whether he was lying when he initialed the photos in the lineups, J.C. gave contradictory answers. At trial, J.C. expressly and repeatedly denied knowing "Mossy" and testified that he did not recall telling the police in 2006 that he knew Mossy. J.C. both denied having identified

22

Saucer as Mossy to the police and denied remembering whether he had done so. J.C. did acknowledge that his memory was better in May 2006 than at trial.

After J.C. and Inspector Pamplona testified about J.C.'s asserted memory lapse, defense counsel objected to the admission of J.C.'s police interview, contending that J.C. suffered from "a genuine lack of memory" and thus "[t]he foundation for prior inconsistent statements had not been laid." Counsel clarified, "I am not making a confrontation clause objection, but—I don't think I can do that, but I am making an objection as far as the foundation under [Evidence Code section] 1235." Pointing to Pamplona's testimony regarding the timing of J.C.'s claimed lack of memory, the prosecutor countered, "[T]here is enough that the jury can infer and should infer that [J.C.'s] failure of recollection is feigned and that they can then consider the prior statements."

The court overruled defense counsel's objection, reasoning that J.C. testified "he was quite certain" he did not know Mossy or recognize Saucer, but was not similarly adamant regarding his cousin Ronnekia, which was "more consistent with an honest failure of recollection." The court continued: "It's also odd, if he really had no memory, no recollection, had no knowledge of [Saucer], that when shown a subpoena with no identifying information except [Saucer's] name, that he would sufficiently understand . . . that it related to the friend of his who was murdered. That suggests he has more memory than he is professing. He admits he remembers [Mascarenas], that he lived in the neighborhood, that he lived near him, but then dissembled a little bit when pressed about that. [¶] I think there is a real issue about whether he has any genuine failure of recollection, especially where he did not raise any failure of recollection when he was first subpoenaed, was

23

cooperative. And it was only thereafter that he suddenly claimed a lack of recollection. [¶] He may, in fact, have some memory loss. I don't know. But he also is quite sure that he would have a good recollection of what happened when the inspector came, that nothing about the incident would affect that, but there were other recent things that he professed a lack of recollection about. [¶] So it sounds like Mr. J.C. is claiming a lack of recollection when it behooves him but not when it doesn't [¶] . . . . [¶] *And I also noticed in terms of his demeanor, he never looked at the defendant. Not once. That struck me as extremely odd. Someone who really had no genuine recollection and was motivated by that to testify as he did rather than by fear or desire not to be involved would have at least looked at the defendant quizzically or something if he really had no recollection at all.*" (Italics added.)

The court concluded impeachment using J.C.'s prior statements was appropriate. Specifically, the court found "it would be appropriate for a jury to conclude that he does not have a genuine global failure of recollection, that there are ample grounds to believe that his—although he may have had an accident, his claim of absolute recollection of nothing is not credible." When given the opportunity for further comment, defense counsel did not object.

## B. The Court Did Not Err in Admitting J.C.'s Prior Statements

Saucer argues the court erred in admitting J.C.'s statements to the police as prior inconsistent statements under Evidence Code section 1235 because the record does not support its finding that J.C.'s claimed lack of memory could be considered "willfully evasive."

A witness's prior statement is not made inadmissible by the hearsay rule if it is inconsistent with the witness's testimony at trial. (Evid. Code, § 1235; see also *id.*, § 770 [evidence of prior inconsistent statement excluded unless witness is afforded opportunity to explain or deny statement and

24

witness has not been excused].)  Inconsistency may be implied where the witness's claim of lack of memory amounts to "deliberate evasion."  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219.)  " ' " 'As long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper.' " ' "  (*People v. Mataele* (2022) 13 Cal.5th 372, 415.)  We review the trial court's rulings on hearsay for abuse of discretion.  (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)

We conclude there was sufficient basis for the trial court to find that J.C.'s professed lack of memory at trial was deliberately evasive and untruthful, such that the court did not abuse its discretion in admitting the challenged evidence.  J.C. testified about events preceding the shooting—such as being friends with Mascarenas and living near him in Richmond—but omitted any facts relating to the shooting itself or his statements to the police regarding the shooting, blaming his lack of recollection on his accident.  As the trial court observed, Inspector Pamplona's testimony that J.C. understood his subpoena—which bore no identifying information other than Saucer's name—related to his friend's murder is circumstantial evidence that he in fact remembered the crime, as is the evidence that J.C. did not raise any failure of recollection when initially subpoenaed in 2019 and 2020, long after his 2018 accident.  Most importantly, J.C. insisted he did not know Saucer, though he "was not similarly adamant" when asked about his own cousin, and he never once looked at Saucer in the courtroom, even as he was asked whether he had identified to the police the man sitting at the defense table as Mossy in 2006.  As the court noted, this behavior was consistent with someone motivated by "fear or desire not to be involved," more than someone lacking genuine recollection.  With the benefit of observing J.C.'s demeanor,

25

the trial court could reasonably find that J.C. was being deliberately evasive in claiming he had no memory of Saucer and the shooting, and thus, that J.C.'s testimony was implicitly inconsistent with his statements to the police. (See *People v. Homick* (2012) 55 Cal.4th 816, 860.) We find no abuse of discretion in the trial court having admitted evidence of J.C.'s interview with police pursuant to Evidence Code section 1235.

Saucer also argues the trial court's admission of J.C.'s statements to the police violated Saucer's "rights to due process and confrontation," and that the trial court applied "the wrong legal standard" when it stated that " 'it would be appropriate for a jury to conclude that [J.C.] does not have a genuine global failure of recollection.' " (Boldface omitted.) Citing Evidence Code section 310,[7] Saucer maintains, "the preliminary question of the admissibility of evidence is a question of law for the court—not the jury—to decide." Although we doubt either of these contentions would succeed on the merits, we decline to address them here because they are forfeited.

Under Evidence Code section 353, subdivision (a), "[a]n objection to evidence must generally be preserved by a specific objection at the time the evidence is introduced." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22.) An objection that a statement violates the hearsay rule does not automatically preserve a Sixth Amendment confrontation clause objection (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314, fn. 3; *People v. Redd* (2010) 48 Cal.4th 691, 730), and in any event, defense counsel here stated he *was not* objecting on federal constitutional grounds but purely as to "foundation under

---

[7] Evidence Code section 310, provides in relevant part, as follows: "All questions of law (including but not limited to questions concerning . . . the admissibility of evidence . . .) are to be decided by the court. Determination of issues of fact preliminary to the admission of evidence are to be decided by the court . . . ."

[Evidence Code section] 1235." Nor did counsel object that the court violated Evidence Code section 310 or applied the wrong legal standard, declining the opportunity to comment after the court indicated how it intended to rule. Accordingly, Saucer's federal constitutional and Evidence Code section 310 contentions are forfeited on appeal.

## II.

## Gang Evidence

Saucer argues "the admission of evidence of numerous gang murders with which [he] had no connection unfairly biased the jury and a new trial is required."

## A. Additional Background

### 1. Gang Evidence Presented at Trial

As noted, Detective Anderson testified as an expert on criminal street gangs in Richmond, including the "Deep C" gang. The letter "C" stands for "Central Richmond"—an area of Richmond known as the "Iron Triangle." A Deep C gang subset known as "The Littles" identifies with the Townhouses, which are located outside the Iron Triangle in South Richmond. Anderson regularly encountered gang members from the Townhouses committing crimes in concert with gang members from the Iron Triangle.

In 2015, there were "[a]pproximately 75 to 100" active members in Deep C. Deep C's primary activities include "[p]ossession of narcotics for sales," "possession of unregistered concealed and loaded firearms, burglaries, robberies, and firearm assaults up to and including murder." Common signs or symbols representing Deep C include major league baseball hats bearing the letters "C" or "CR." Some gang members use the letter "L" for "The Littles" or the number "5," which represents "Nickel Block"—"one of the original blocks of Deep C."

27

Deep C is a nontraditional gang with "no formal entry or exit" processes. "[S]imply by being from a certain neighborhood, you could be a target if you are a young man of a certain age." One could be a target for being "related to somebody" to "friends with somebody."

Detective Anderson testified regarding specific members of Deep C and the predicate offenses of which they had been convicted, including transportation for sale of narcotics, assault with a firearm, manslaughter, and murder. In each case, the defendant was someone Anderson knew to be a Deep C member, and the named victims were persons he knew to be associated with rival gangs. Other than their role in Deep C and these predicate offenses, none of those defendants was otherwise associated with this case.

Based on posts and photographs appearing on Anthony Timmons's Facebook page as well as his personal familiarity with Timmons, Detective Anderson opined that in 2015, Timmons was a member of The Littles subset of the Deep C gang. In a September 2, 2015 post, Timmons quoted in a social media post a song called "Murder, Murder, Murder," written by other members of The Littles and taking credit for several homicides in Richmond. Anderson testified that the song was only popular in Richmond and specifically with the Littles.

Detective Anderson opined that Saucer, too, was a Deep C gang member in 2015. Anderson was familiar with Saucer and had contacts with him before his arrest for the Roberts murder. During one such contact, Saucer "identif[ied] a particular gang affiliation" by stating he was "from 5th Street." According to Anderson, someone who grew up in Richmond but had "no gang ties" would not "talk about being from 5th Street." Saucer's statements during his police interview that "he had problems with people

28

from North, from 25th Street, and from Easter Hill, and that Detective Wentz would have been better off saying that [Saucer] had shot people in North or the Manor" further signified his gang affiliation, according to Anderson. "Having problems with those groups is consistent with somebody being . . . associated with Deep C" since "individuals associated with the Manor . . . were rivals." But Anderson also acknowledged that Saucer's name had not come up in a large wiretap investigation of Deep C he had recently conducted and that, whether or not Saucer was a gang member, he "could be associated with Central Richmond and have problems with North Richmond." That Saucer did not flout his gang affiliation on social media did not change Anderson's opinion because older gang members were "savvy to law enforcement monitoring" it.

When asked by the prosecutor a hypothetical wherein two individuals affiliated with Deep C killed a man whom they mistakenly believed to be a witness to a prior murder perpetrated by one of the individuals, Detective Anderson opined the murder would be "done for the benefit of, at the direction of, and in association with the Deep C criminal street gang" "to promote, further, and assist in criminal activities by members of that gang." Anderson explained that criminal gangs, specifically Deep C, "rely on the power of respect for their gang to be a successful organization. Most of that power comes from their propensity to commit violence and their representation of being violent." "[R]etaliating against witnesses or perceived witnesses" instills "fear in the community" and enables gangs to stay active without interference from law enforcement. Anderson had personally "observed a chilling effect" from "the [gang's] reputation for going after witnesses" when "interview[ing] victims and witnesses of crimes in [his] work."

29

Detective Anderson's opinion would not change if "there [were] no allegation that the earlier murder was gang-related itself." Gang members do not "bring spectators along to watch them commit crimes." Anderson's opinion would not change if the gang members were from different subsets. Although "the motive to eliminate a witness would exist for anybody" regardless of gang membership, gang members could trust one another to not cooperate with law enforcement and to defend their fellow gang member.

## 2. Amendment to Gang Laws

Prior to sentencing, Saucer moved for a new trial, arguing that newly enacted Assembly Bill 333 required reversal of all convictions and findings. Section 1109,[8] which was enacted as part of Assembly Bill 333, gives a defendant charged with a gang enhancement under section 186.22, subdivision (b) the choice of bifurcating the trial on any underlying offenses from the trial on the gang enhancement.

_____

[8] Section 1109 reads in full, "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence. [¶] (b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

The court granted the motion as to the gang-related conspiracy conviction (§ 182 [count 2]), the gang special circumstances allegation (§ 190.22, subd. (a)(22) [count 1]), and the gang penalty provision (§ 186.22, subd. (b)(5) [count 3]).  The court denied the motion as to the two murder convictions (§ 187 [counts 1 & 4]) and related enhancements of (§§ 190.2, subd. (a)(3), 12022.53, subd. (d)), and as to the dissuading a witness conviction (§ 136.1, subd. (c)(1) [count 3]), but thereafter the court granted the People's motion to dismiss the gang-related conviction, special circumstance, *and* enhancements in the interests of justice.

## B. Admitting the Gang Evidence Was Not Prejudicial Error

Relying on the bifurcation provisions set forth in the new section 1109, Saucer argues the trial court erred in denying his motion for a new trial on the murder and dissuading witnesses counts because the gang evidence rendered his trial fundamentally unfair.  But Saucer acknowledges, admission of the gang evidence at Saucer's trial "may not have technically been error because it was permitted under the rules in effect at the time." And he further acknowledges that our Supreme Court has held section 1109 does not apply retroactively.  (*People v. Burgos* (2024) 16 Cal.5th 1, 7–8.) Thus, Saucer's argument that the gang special circumstance "would be bifurcated under [Assembly Bill] 333" and section 1109 is beside the point. (Boldface omitted.)  Even if admission of the gang evidence would have been error under section 1109, that statute was enacted too late to apply to Saucer's trial.  Thus, Saucer's arguments that "the error" was not harmless and that "[t]he erroneous admission of gang evidence" offends due process both fail at the threshold because he has shown no error under governing law.

# III.

## Voluntariness of Saucer's Statements to Police

Saucer next contends the court should have suppressed all evidence of his December 1, 2015 interview because his statements were the product of coercive police tactics.

## A. Additional Background

### 1. The Interviews

First Interview

The first police interview started on December 1, 2015, at either 2:00 or 2:30 p.m. and lasted until 4:30 or 4:43 p.m. At the start, Detective Wentz introduced himself and Detective Anderson and advised Saucer that he was "free to leave . . . anytime." As Saucer had "concerns about" "work[ing] off something" for another detective, in an "overabundance of caution," Wentz read Saucer his *Miranda* rights. Saucer said he did not understand them, that he was "incompetent," and that he did not know how to read.

Wentz explained he was investigating a murder and that someone told him Saucer was "with another person when someone was shot and killed." Saucer denied killing anybody or knowing anything about a murder. Saucer represented that he tried to obtain information about the killing when another detective told him "to talk to Ant," and Saucer asserted that if he knew about the murder, he "would tell," volunteering, "I got my daughter." Wentz said he knew Saucer was present during the murder because of surveillance footage and a witness identifying Saucer at the scene. Wentz stated, "Bro, if you're there with somebody and there's some killing going down, it's important that you get that off your chest man." When Saucer denied knowledge, Wentz stated, "You were there man. You were there and I actually went out and got a warrant for you to arrest you for it. And I was

32

hoping you'd do the right thing." Saucer replied, "So y'all about to take me to jail for murder," and Wentz stated, "Yes."

After Saucer again denied killing anyone or knowing who did, Wentz responded, "Bro, listen to me. I'm not messing around anymore, okay? You and the person you were with have no fucking right to take someone's life." "To shoot and kill them in the street for no fucking reason, okay? I'm not going to play games." After Saucer said, "I know you're not," Wentz replied, "I fucking have done my homework. I've been working on this case for two months, all right? And now I'm going to arrest you and I'm going to arrest the other guy." Wentz continued, "So if you want to take the ride for it because you don't want to say anything [¶] . . . [¶] [t]hen that's up to you."

Saucer said, "I just want to be with my daughter." In response, Anderson stated, "Then it's time to come clean." Saucer again denied killing anyone.

After more back and forth, Detective Anderson stated, "This is going to be your last chance," and Saucer stated, referring to Wentz, "That guy just told me right now I can leave and walk." Anderson repeated, "This is going to be your last chance. This is your opportunity." When Saucer again denied involvement, Wentz said, "I guess we'll just book you for murder, and like I said, I'll file the case tomorrow [¶] . . . [¶] and you can go to court."

After more denials, Wentz told Saucer he was "making the decision not to" tell them what happened, although the detectives were "[t]rying to give [him] an opportunity." Saucer replied, "That's fucked up man," and, "I don't have no reason to kill no 65 year old." Wentz replied, "I agree with you that it's fucked up that you're going to jail, but guess whose choice that is?" After asking to call his wife to advise her he was "going to jail for murder," Saucer volunteered that the police could "put an ankle monitor on me."

33

At some point, Saucer said, "Sir, I'm not about to sit here. I got a daughter." Wentz stated, "You're doing the wrong thing for your daughter, dude." Wentz asked, "How do you think she's going to feel when her dad's locked up in prison for a significant amount of time and it's all because he didn't want to tell the truth about what he saw?"

Following Saucer's additional denials, Wentz urged him to "do the right thing" and explain what happened, and Saucer replied, "The only thing I care about is my daughter, man." Wentz responded, "Then do this for your daughter. Tell me what happened for your daughter." Saucer persisted in his denials and stated, "So you was lying when you told me I can leave." Wentz replied, "No, at the time I did. But then you said you weren't understanding what I was telling you." Wentz added, "We can dance around different language, but the fact of the matter is, we're here to clear up a murder that you were at. And if you want to stick with your story that you don't know anything, that's up to you. If you want to do the right thing for yourself and your daughter, you tell us what you saw, what happened." After more denials from Saucer, Wentz stated, "Okay, then I guess you're going to jail."

The conversation continued in much the same way until Wentz stated, "All right, well let me go get someone to get the paperwork started on you, and then we get you back in the jail and they'll be shipping you off over to Martinez, okay?" Saucer said, "I'll fucking tell you, Anderson," and Anderson replied, "You've had your opportunity." Saucer asked to speak to Detective Mike Ricchuito, who had previously asked him to supply information against Timmons as part of "work[ing] off" an unrelated charge, and Wentz replied, "I'll see if he's around."

34

When Detective Ricchuito entered the room, Saucer stated he was being taken "to jail for murder." Ricchuito explained, "[H]e's not accusing you of killing anybody. You understand that, right? He's not saying you did it, he wants to find out what happened," and noted the police knew Saucer was "there." Saucer said he would find out what happened, and Wentz pointed out that Saucer already knew what happened. Saucer asked, "What you all want me to do man?" and Wentz replied, *"Tell me the truth about what happened."* (Italics added.)

After Saucer denied being the shooter, Wentz stated, "Then be a witness for me," and added, "I know you didn't pull the trigger. . . . If you answer those questions, you show me that you were there, you will have proved to me that you were there, and that you didn't do it." Ricchuito interjected, "This is your freedom." Wentz continued, "I want you to give me some specifics about what you saw, then I know that you were there, and then I know that you didn't pull the trigger. Do you understand how that works?" Saucer responded, "I did not kill nobody."

At one point, Saucer said, "I can't believe you all are doing this to me," and Wentz asked, "Giving you the opportunity to save yourself and to let you see your daughter and have a life with her?" Ricchuito pointed out, "You know . . . we could have just fucking booked you on it. And that's that." After more denials from Saucer, Ricchuito stated, "This is your life right now. . . . Twenty years in prison? Witness SEC? Or possibly probation." Saucer responded, "I'm going to jail already."

Ricchuito asked, "In your head, what do you think the outcome of today is?" and Saucer said, "I'm hoping I get to walk out of here." Wentz stated, "Tell me what you have to say, and we will consider everything."

Later Saucer said, "Listen, already been working for you all, so you all got a reason to take me to jail anyway," and Wentz responded, "I don't have any reason. I have a murder warrant from you [*sic*]. And that doesn't mean that the case is filed. *That means you can sit in for 72 hours. And if the DA files charges, you stay. If they don't, you're out*." (Italics added.)

At some point, Wentz stated, "I really want you to consider telling me what you saw that night. It will be very beneficial to you. Right?" When Saucer suggested the police were "trying to make [him] say" something, Wentz corrected him, "*I'm not trying to make you say anything, I'm trying to encourage you to tell me the truth*." (Italics added.)

Saucer continued to deny his involvement and said to the detectives, "I just got too much shit on my record, man. Now I'm going to jail for this. Over a little ass kid. He out there shooting people left and right." Wentz replied, "If you told us what you saw, then maybe your life won't be over." Anderson interjected, "*But if you're going to hold it in, then you might not see your daughter again*." (Italics added.)

Towards the end of the interview, Saucer became emotional while talking to his wife on the phone; he dropped to the floor and cried as he told the person on the phone to tell his daughter that he loved her.

Second Interview

After being brought back to the holding cell, Saucer asked to speak to Detective Wentz. The second interview took place around 5:55 p.m. outside of the interview room because Saucer had concerns about the conversation being recorded. Saucer said, "I just wanna talk to you," and Wentz responded, "If you weren't involved in the crime, you get to get outta here." Saucer replied, "You lyin'. No way. Can I please talk to you out there, one more time, please? Please, sir?" Saucer and Wentz spoke in an outdoor area

where Saucer admitted having been present when Timmons killed Roberts after purportedly arranging to sell him drugs. Saucer provided details about the crime and the car involved and offered to testify against Timmons.[9]

Third Interview

At 6:55 p.m., Saucer again asked to speak to the detectives, and they talked in the sally port area of the jail. Ricchuito stated to Saucer, "You're gonna be out tonight or within 72. Okay? Or in 72." In a phone call ostensibly to his wife, Saucer said, "They talkin' about I'm gonna do 72. I wanna come home to y'all." Saucer continued, "That's what they said but I don't think so. I get up in there, they not gonna let me go." Ricchuito reiterated, "Dude, you're getting 72 at worse. I promise you that." "I promise you you're getting 72 at worst." Saucer said to his wife that he would testify so as not to go to "jail for these little ass kids."

At one point, Saucer said to Wentz, "I'm gonna testify," and Wentz said, "I know, and that's good. You're doing the right thing, that's what you need to do." Saucer provided an account similar to the second interview. When Saucer asked whether Wentz promised to let him go, Wentz replied, "I'm still checkin' on it, man," adding, "I gotta see if it's gonna be a 72 or if it's gonna be a . . . wait till the weekend."

Fourth Interview

On December 2, 2015, at 1:30 p.m., Saucer again sought to speak with Wentz, reiterating his offer of testifying for the prosecution against Timmons. Saucer denied personally killing the victim and represented that he had told

---

[9] In the motion to suppress, defense counsel asserted that near the end of the interview, Wentz told Saucer, " 'There's a very good possibility you're going home.' " As the portions of the second interview do not appear to be recorded, there is no way to verify this statement.

C.P.M. that Timmons killed the man. Saucer denied knowing why Timmons killed him. Wentz told Saucer, "[W]hat you'll be charged with, what, if anything, I don't know. It may be nothing. It may be murder. It may be [an] accessory. . . . That's what the DA has to figure out."

Fifth Interview

The fifth interview occurred at 12:50 p.m. on December 4, 2015. Saucer asked whether he was going to be released, and Wentz answered negatively before reading the *Miranda* rights and stating, "I can't interview you anymore if you say you don't understand your rights." Saucer replied, "I didn't understand them the first time you read them to me." Saucer attempted to speak to Wentz about the case, but Wentz responded, "We can have a conversation about it, but I'm prevented from doing that because you don't understand your rights. So I have to stop." When Saucer asked, "Why didn't you stop the first time that I told you that?" Wentz responded, "Because you understand what I'm saying." Saucer responded, "No, I don't. *If I understand, I wouldn't have talked.*" (Italics added.) Saucer ultimately acknowledged understanding his rights, refused to answer certain questions, and again denied his guilt before stating, "I'm done talking man." Saucer then continued to talk to Wentz.

### 2. Motion to Suppress

Prior to the first day of testimony, defense counsel filed a motion to suppress Saucer's statements made during his police interviews, in part on the grounds they were involuntary. Defense counsel argued that the detectives' promises of leniency rendered Saucer's statements involuntary. Counsel also argued that Saucer's "intellectual disabilities" affected the voluntariness of his statements. Finally, counsel claimed that "the detectives

38

talked about Mr. Saucer not being able to see his daughter if he refused to say what they wanted."

Attached to the motion to suppress were two psychological reports by Jon Bathori, Psy.D. In an April 27, 2015 report, Dr. Bathori found that Saucer was "incompetent to stand trial" because of "his mental retardation." Bathori reported that Saucer had been living on his own since about the age of 14 and had acquired " 'street smarts,' " but he suffered from "a mild" intellectual disability with an IQ of 63. Bathori acknowledged that other testing have diagnosed Saucer with "Borderline Intelligence," having an "IQ of slightly over 70." Bathori indicated there were "numerous technical problems with this diagnosis" but did not further elaborate. He did opine that in his testing Saucer was not malingering.

In a September 26, 2016 report, Dr. Bathori reiterated his opinion that Saucer was not feigning incompetence. Bathori stated that Saucer did not have "delusions or clear indications of severe psychopathology that impairs his working relationship with defense counsel." However, Saucer had "deficits in his rudimentary communications skills and basic understanding" and "his overall rational abilities."

Dr. Bathori acknowledged that just several months earlier, in April 2016, Paul Good, Ph.D. had found Saucer competent to stand trial. Bathori stated there was "little room for argument about Dr. Good's data, but room for debate regarding his conclusions" that Saucer was malingering because "variable effort is not automatically an indication of malingering." Dr. Bathori opined that instances of Saucer's knowledge and functioning inconsistent with intellectual disability "can be very misleading."

39

### 3. People's Opposition

In opposition, the prosecutor noted that Saucer had been working as a police informant with "a level of comprehension and intelligence well above his IQ level." The prosecutor argued that "[d]iscussion of the potential consequences of the crime," as well as the other police tactics, were permissible.

The prosecutor attached police reports outlining Saucer's activities as a police informant and his understanding of the *Miranda* admonition during a prior arrest. The prosecutor also attached the April 2016 competency report by Dr. Good stating, among other things, that testing revealed Saucer likely "exaggerat[ed]" or "fabricat[ed]" his psychological symptoms, and that his scores were "characteristic of individuals who are feigning a mental disorder" but "rarely seen in clients responding truthfully."

According to Dr. Good, Saucer "has consistently tested with limited intellectual resources," and his "IQ scores have consistently fallen in the borderline to mild mental retardation range," with scores ranging between 72 and 69. Other doctors who had tested Saucer "agree[d] he is intellectually impaired." Nevertheless, Dr. Good referenced a 2015 evaluation that showed Saucer "was functional enough to live independently" and " 'ha[d] a longstanding history of manipulative and coercive behaviors.' " Good reported that Saucer told the 2015 assessor that " '*he understands and knows his rights*.' " (Italics added.) Good opined that Saucer had "the capability to function adequately in society and take care of his basic needs" and was "not psychotic."

Dr. Good also noted that "when detectives approached [Saucer regarding] giving information about other criminal activity[,] he was totally aware of the implications for negotiating a better disposition for himself in

40

this case. He knew he could 'testify' and 'take the stand' to provide the information and gain himself a reprieve of some sort. [Saucer] underst[ood] the basic meaning of evidence and was able to give some examples of evidence." Dr. Good further reported that Saucer "refused to tell [him] about the events leading to his arrest on the advice of his attorney, suggesting that he had retained the advice of his attorney, and that he was smart enough to realize it might not be good for him to talk about his case." Good remarked that "[g]iven these competent understandings of the process, it was surprising that he could not explain the role of the judge, jury or prosecutor."

Dr. Good further noted several doctors concluded that Saucer was "genuinely impaired cognitively and emotionally," while others "opined that he was feigning deficits and was actually competent." Good administered seven malingering tests, and Saucer was "clearly in the malingered range" for five of them.

As evidence of malingering, Dr. Good cited C.P.M.'s statement that Saucer "play[ed] being crazy" and Saucer's manipulation of staff while an inpatient at the state hospital. Good opined that Saucer "ha[d] significant cognitive limitations" but "exaggerat[ed] his psychological symptoms" and "deliberately underachiev[ed] on tests of competency." (Boldface omitted.)

### 4. Trial Court's Ruling

After hearing the parties' arguments, the court denied the suppression motion as to four of the five interviews. The court discredited Saucer's assertions during the first interview that he did not understand the *Miranda* warnings, stating, "I have really no substantial doubt at all that [Saucer] understood his rights, invokes them when he feels like it, parr[ies] when he thinks he can get something out of it, and is trying to have it both ways." The court observed that Saucer's statement in the fifth interview, that if he

41

understood his rights he would not have talked, was evidence that he did indeed understand his rights. The court added, "that said to me that he's playing fast and loose here, which is consistent with someone who has asserted his rights in the past, with someone who has a history of malingering, as reflected in Dr. Good's report, and the summaries of all of the other reports here."

However, the court found there was a *Miranda* violation during the fifth interview when conversation continued after Saucer was " 'done talking,' " and suppressed Saucer's statements after that point, which the prosecutor noted were "largely duplicative of things that had already been said."

The court determined there was no police coercion because "in context, the statements were nowhere near as coercive as they appeared when isolated from context." The court reasoned, "[T]he officers were giving [Saucer] an explanation of the range of possibilities: that he could be a witness; that he could be a defendant; that he could get probation; that he could go away for life." Nowhere did the officers "tie what would happened to what [Saucer] said," there was no promise of a benefit if Saucer told the officers what they wanted to know, and Saucer did not "say anything for a long time."

The court noted that Saucer "turned" his emotional displays "on" and "off", and that he "was the one who was raising the issue about his daughter." The court found the reference to Saucer's inability to see his daughter if he went to prison for life was a true statement of the consequences that flowed from the range of penological possibilities before him.

42

**B. Applicable Law and Standard of Review**

" 'The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make "inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." ' [Citation.] The prosecution must prove by a preponderance of the evidence that a defendant freely and voluntarily gave police statements before the statements can be admitted. [Citation.] ' "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 740 (*Peoples*).) We thus consider a variety of factors, including: whether the defendant was advised of his or her *Miranda* rights; any element of police coercion; the length of the interrogation and its location and continuity; any previous experience of the defendant with the criminal justice system; and the defendant's maturity, education, and physical and mental health. (*Withrow v. Williams* (1993) 507 U.S. 680, 693–694; see *Peoples*, at p. 740; *People v. Williams* (2010) 49 Cal.4th 405, 442.)

While all the facts and circumstances must be considered, "[a] finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked." (*People v. Maury* (2003) 30 Cal.4th 342, 404–405.) It follows that "a defendant's 'compromised physical and psychological condition' alone will not render [his or her] statements

involuntary." (*People v. Caro* (2019) 7 Cal.5th 463, 493; accord, *People v. Hensley* (2014) 59 Cal.4th 788, 814; *People v. Bradford* (1997) 14 Cal.4th 1005, 1045.)

In the end, "[t]he determinative question ' "is whether defendant's choice to confess was not 'essentially free' because [his or her] will was overborne." ' " (*Peoples*, *supra*, 62 Cal.4th at p. 740.) " ' "When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness." ' " (*Ibid*.)

**C. Saucer's Statements to Police Were Not Involuntary**

Saucer contends that his incriminating statements were involuntary because he was coerced by the detectives' implied promise of leniency, which was conveyed through the detectives' suggestions that if he told them what he witnessed he could be released and/or receive probation. When these challenged statements are viewed in the context of the entire interviews, Saucer's coercion claim does not withstand scrutiny.

The interview tapes and corresponding transcripts make clear that, to the extent the detectives made a promise in the first two interviews, it was an offer to help Saucer avoid a murder charge by telling the truth about what happened. Pointing out a benefit that could flow naturally from a truthful course of conduct is neither a threat nor a promise of leniency. (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1212 [collecting cases].) Wentz told Saucer he had gotten a warrant for Saucer's arrest, and Wentz intended to book him on the warrant unless Saucer gave him "a reasonable explanation" for why he was "there" when "the other guy" shot Roberts. Saucer expressed the hope that he would be able to "walk out of here" after the interview, and Wentz responded, "Tell me what you have to say, and we will consider

44

everything." Later, expressing unwarranted optimism, Wentz encouraged Saucer, "I really want you to consider telling me what you saw that night. It will be very beneficial to you. Right?" But the context for these remarks suggests the detectives were offering Saucer "an opportunity to save [him]self" from "[t]wenty years in prison" if he had an exonerating story, not that they were promising leniency.

By the third interview, Saucer was promised that he could soon go home, but this promise came too late to be the inducement that caused Saucer to provide a statement. It was *after* Saucer told the police that he had indeed been with Timmons when Roberts was shot, providing details about their activity that evening and offering to testify against Timmons, that Wentz purportedly told Saucer, " 'There's a very good possibility you're going home.' " And a short time later, during the third interview, Ricchuito "promise[d]" Saucer he would be out in "72 [hours] at worst," but again this was after Saucer had already told the detectives how Timmons shot Roberts. "An improper promise 'must be causally linked' to the defendant's confession to warrant exclusion . . . ." (*People v. Wall* (2017) 3 Cal.5th 1048, 1066.) That link is not apparent here because the promise Saucer would soon be free to go home was made only after Saucer confessed to being present with Timmons at the scene of the crime.

Equally unavailing is Saucer's claims that his intellectual disability rendered his statements involuntary. As he did in the trial court, Saucer relies on *U.S. v. Preston* (9th Cir. 2014) 751 F.3d 1008 (*Preston*). *Preston* involved an intellectually disabled 18-year-old defendant, who lived with his parents on the Navajo Nation. (*Id.* at pp. 1010–1011.) The family had a longstanding feud with a neighboring household. (*Id.* at p. 1011.) The feud had taken some "unusual turns," including that the defendant believed his

45

neighbors used " 'witchcraft' " to paralyze his father for three months. (*Ibid.*) Defendant would later confess to molesting an eight-year-old neighbor from the feuding household. (*Id.* at pp. 1011, 1014.) The Ninth Circuit held the confession was involuntary based on a combination of the 18-year-old defendant's intellectual disability (an IQ of 65) and the coercive interrogation tactics used, including false promises that the defendant's statement would be kept confidential and was just an apology note to the victim. (*Id.* at pp. 1010, 1028, 1032.)

Here, by contrast, Saucer was a street savvy adult (nearly 34 years old at the time of the interviews), with considerable experience in the criminal justice system and a "history of manipulative" behavior. Although Saucer was unquestionably intellectually impaired, there was evidence that his IQ score was in the range of 69–72, that he was "functional enough to live independently," and that he knew how to "sell drugs and count money." Saucer was also familiar with the justice system, having been previously arrested multiple times: in connection with the Mascarenas murder, an unrelated gun charge, and two prior driving while intoxicated offenses. At the time of the December 1, 2015 interviews, Saucer was also working as a police informant, "working off" a prior gun case, and during the interviews he offered to testify against Timmons and to wear an ankle monitor if the police would release him.

Moreover, the interrogation tactics used here are distinguishable from those used in *Preston*. There are no allegations that the detectives attempted to question Saucer in a manner that might trick or confuse him so as to be "psychologically coercive." (*Preston, supra*, 751 F.3d at p. 1028.) And Saucer's incriminating statements cannot be fairly described as "a brief gathering of details chosen by the officers, and written out in [the

46

interviewing agent's] hand" as the Ninth Circuit described the confession in *Preston*. (*Id*. at p. 1014.)

Finally, Saucer argues that the detectives unfairly preyed on his paternal instincts. He argues the detectives' comments about his daughter are akin to those found coercive in *Lynumn v. Illinois* (1963) 372 U.S. 528 (*Lynumn*) and *U.S. v. Tingle* (9th Cir. 1981) 658 F.2d 1332 (*Tingle*). We disagree.

In *Lynumn*, the officer questioning the defendant about an alleged narcotics sale told her that if she did not cooperate her government aid would be cut off and her children would be taken away. (*Lynumn, supra*, 372 U.S. at p. 533.) As the defendant described it, the officer " 'started telling me I could get 10 years and the children could be taken away, and after I got out they would be taken away and strangers would have them, and if I could cooperate he would see they weren't; and he would recommend leniency and . . . I had better say what they wanted me to, or I would lose the kids. I said I would say anything they wanted me to say. I asked what I was to say. I was told to say "You must admit you gave Zeno the package" so I said, "Yes, I gave it to him." ' " (*Id*. at pp. 531–532.) The *Lynumn* court found "it clear that a confession made under such circumstances must be deemed not voluntary, but coerced." (*Id*. at p. 534.)

In *Tingle,* a federal agent, questioning a bank robbery suspect, told the woman she would not or might not see her child for a while if she went to prison. (*Tingle, supra*, 658 F.2d at p. 1334.) The Ninth Circuit found the interrogation to have been coercive based on the following facts: "[t]he warnings that a lengthy prison term could be imposed, that Tingle had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might

not see her two-year-old child for a while," all of which "must be read together." (*Tingle, supra*, 658 F.2d at p. 1336, fns. omitted.)

The questioning in both *Lynumn* and *Tingle* sought to exploit the parents' fear of separation from their children to elicit confessions. In both cases, the interrogator appears to have initiated the subject of separation, linking it to cooperation. (*Lynumn, supra*, 372 U.S. at pp. 532–533; *Tingle, supra*, 658 F.2d at p. 1334.) And in both cases, the interrogations were coercive in other regards as well: In *Lynumn* the officers told the defendant what to say (*Lynumn* at pp. 531–532), and in *Tingle*, the agent impermissibly threatened to tell the prosecutor that the defendant had failed to cooperate, even though "[r]efusal to cooperate is every defendant's right under the fifth amendment" (*Tingle* at p. 1336, fn. 5).

Here, in contrast, Saucer himself first brought up the topic of his daughter and then often returned to this theme. Saucer used his daughter to explain why he worked as an informant, was telling the truth, and could not have killed anyone. As the prosecutor argued below, Saucer also attempted to manipulate the officers emotionally by telling them about how his daughter cried after he dropped her off that morning because "she had a feeling" she would not be seeing him again. And at least in the first two interviews the detectives made no promises of leniency and repeatedly told Saucer they were "not trying to make [him] say anything" except "to tell [them] the truth."

We conclude the detectives' references to Saucer's daughter were not coercive under the totality of the circumstances. Each reference to Saucer potentially being separated from his daughter, or to her having to visit him in prison, was a truthful statement of a potential penological possibility Saucer faced. "[A] simple statement of fact by the police" is permissible. (*People v.*

48

*Bryan* (1967) 254 Cal.App.2d 231, 233.)  The references were also flanked by the detectives' suggestions that Saucer would not "have to go down" for the Roberts murder if he provided "a reasonable explanation" for his presence at the crime scene, and that his prospects were better if he could demonstrate he was not the killer.  Comments "explain[ing] the possible consequences depending upon [a suspect's] motivations and involvement in the shooting" are not " 'threats' or 'false promises of leniency.' " (*People v. Maestas* (1987) 194 Cal.App.3d 1499, 1507, fn. omitted.)

Notably, the detectives did not try to use any threat involving Saucer's daughter as leverage.  Rather, they exhorted Saucer to tell the truth, which is permissible.  (*People v. Carrington* (2009) 47 Cal.4th 145, 174; see also *Ortiz v. Uribe* (9th Cir. 2011) 671 F.3d 863, 872 [reminding defendant of his "obligation to his family to tell the truth and that his children were counting on him to do the right thing" were "permissible psychological appeals to his conscience"].)  The detectives made clear that no one was taking Saucer's daughter away because no jury had yet found him guilty, and that even a murder charge did not necessarily mean conviction and life imprisonment— all true statements that were neither promises nor threats.

Saucer's arguments fail because they ignore the context and totality of the circumstances surrounding the discussions of his daughter.  Our task, looking at the totality of the circumstances, is to ask " 'whether the influences brought to bear upon the accused were "such as to overbear [defendant's] will to resist and bring about confessions not freely self-determined." ' " (*People v. Kelly* (1990) 51 Cal.3d 931, 952.)  We note that in the video clips and audio recordings of Saucer's interrogation, Saucer presents as a savvy, mature man trying to avoid being sent to jail; he never appears cowed or browbeaten.  The questioning was not abusive, and Saucer was allowed to make phone calls

49

and take a cigarette break. And the subject of Saucer's daughter was not a "major" or "dominant" theme of the questioning. (*Brown v. Horell* (9th Cir. 2011) 644 F.3d 969, 980.) In sum, we are satisfied that nothing in the December 1 interviews was so coercive as to overcome Saucer's free will or constitute "a motivating cause" of his incriminating statements. (*Kelly,* at p. 953, see also p. 952.)

## IV.

### Jury Instruction Regarding Saucer's Intoxication

Saucer testified that prior to his police interviews he consumed alcohol, ecstasy, and marijuana, and he contends the trial court erred by instructing the jury it could not consider his intoxication when evaluating incriminating statements he made during the interviews. The People argue Saucer has forfeited this claim by failing to raise it below and that, even if preserved for appeal, this claim of error fails on the merits, and any error was harmless.

## A. Additional Background

In the charge conference, defense counsel objected that CALCRIM No. 625 erroneously informed the jury it could not consider voluntary intoxication in evaluating the credibility of witness testimony and Saucer's police interview. The court and prosecutor pointed out that CALCRIM No. 625 pertained to the relevance of "the defendant's intoxication at the time of the crimes," not to the relevance of intoxication to anything else. The court offered to add to the instruction that it specifically related to "the time of the alleged crimes."

Defense counsel did not object to the proposed remedy or request language affirmatively informing the jury it could consider Saucer's intoxication in evaluating his police interviews. Nor did counsel object to the

50

court's giving CALCRIM No. 362 regarding false statements indicating consciousness of guilt.

Thus, the jury was instructed, in relevant part: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." And then a few minutes later, "You may consider evidence, if any, of the defendant's voluntary intoxication at the time of the crimes alleged only in a limited way. [¶] With respect to the crime of murder, as charged in Counts 1 and 4, you may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, including whether the defendant knew Anthony Timmons intended to commit murder and the defendant intended to aid and abet Anthony Timmons in committing murder." A similar paragraph then explained how the jury could consider evidence of voluntary intoxication with regard to the other charged crimes and a special finding, before the instruction concluded, "You may not consider evidence of voluntary intoxication for any other purpose."

In closing argument, defense counsel addressed Saucer's intoxication during the police interviews, stating that Saucer was "incredibly emotional" and "not acting like a normal, sober, rational person," which "may be related to him being under the influence of various things." Counsel continued, "You can see him on the floor crying. You can see him . . . going from extremes. That is consistent with somebody maybe being under the influence of

51

something."  Counsel maintained the police pressured Saucer, who was on an "emotional roller coaster."

## B. Standard of Review

Whether a jury instruction correctly states the law is reviewed under the independent or de novo standard of review.  (*People v. Kumar* (2019) 39 Cal.App.5th 557, 563.)  The appellate court "must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record."  (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)  "What is crucial . . . is the meaning that the instructions *communicated to the jury*.  If that meaning was not objectionable, the instructions cannot be deemed erroneous."  (*People v. Benson* (1990) 52 Cal.3d 754, 801.)  The correctness of the jury instructions " ' "is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 (*Musselwhite*).)

## C. Analysis

Saucer's claim of error is premised on *People v. Wiidanen* (2011) 201 Cal.App.4th 526 (*Wiidanen*), which held a trial court erred in instructing the jury with both the consciousness of guilt instruction (CALCRIM No. 362) and an unmodified version of a voluntary intoxication instruction then found at CALCRIM No. 3426.  (*Wiidanen*, at p. 533.)

In *Wiidanen*, the defendant was convicted of sexually assaulting an unconscious person after a New Year's Eve party.  (*Wiidanen, supra*, 201 Cal.App.4th at p. 528–529.)  There was evidence the defendant was highly intoxicated at the time of the crime.  (*Id.* at p. 531.)  When interviewed by police a few hours later, the defendant said he was intoxicated and could not remember the party, but he repeatedly denied the allegation and was sure he

had not committed the crime. (*Id.* at p. 530.) Two hours after the police contacted him, a preliminary alcohol screening indicated the defendant's blood-alcohol level was .22 percent. (*Id.* at pp. 529, 531.)

The *Wiidanen* court held that, "[u]nmodified, the voluntary intoxication instruction allowed the jury to consider defendant's voluntary intoxication *only* in deciding whether defendant knew the victim was unconscious during the oral copulation. This limitation erroneously prohibited the jury from considering evidence of defendant's voluntary intoxication in determining whether defendant made false or misleading statements relating to the oral copulation *knowing* the statements were false or intending to mislead." (*Wiidanen, supra,* 201 Cal.App.4th p. 528.)

But the instructions in *Wiidanen* were materially different from the instructions in this case. There, the jury was told, " 'You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant had the knowledge that the victim was unconscious of the act at the time of its occurrence." (*Wiidanen, supra,* 201 Cal.App.4th p. 532, fn. 5.) A definition of voluntary intoxication followed, and then the instruction concluded, "You may not consider evidence of voluntary intoxication for any other purpose. . . ." (*Ibid.*) Here, because the pattern instruction was different and the trial court modified it to address Saucer's concern, the jury was told it could make only limited use of evidence of voluntary intoxication *at the time of the crimes*, not at the time of Saucer's police interview. Specifically, the jury was instructed, "You may consider evidence, if any, of the defendant's voluntary intoxication at the time of the crimes alleged only in a limited way." The jury was then instructed exactly how that evidence could be used with regard to the specific crimes alleged before the instruction concluded,

"You may not consider evidence of voluntary intoxication for any other purpose."

In his reply brief, Saucer rests his argument on this final line of the amended instruction. On its own this sentence would indeed be problematic for the reasons explained in *Wiidanen*, but we must consider the entire charge. (*Musselwhite*, *supra*, 17 Cal.4th at p. 1248.) In context, we do not think the jury could have understood this one sentence to prevent it from considering evidence of Saucer's voluntary intoxication during the police interviews, for purposes of explaining the statements he made there. The potentially problematic sentence concludes an instruction that is expressly— and completely—about how the jury should consider evidence of "voluntary intoxication at the time of the crimes." A different instruction expressly informed the jury that if it found "the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, . . . you *may* consider it in determining his guilt," but "it is *up to you* to decide its meaning and importance." (Italics added.)

We note that Detective Wentz—who was trained in alcohol and controlled substance evaluations—did not observe signs of ecstasy or alcohol intoxication when he interviewed Saucer. But if the jury assessed the evidence as suggesting Saucer was voluntarily intoxicated when he spoke with the detectives, we think the jury instructions allowed it to decide for itself "the meaning and importance" of Saucer's statements for themselves. The law requires nothing more.

54

# V.

## Sufficiency of the Evidence

Saucer was found guilty of first degree murder as a direct aider and abettor in the killing of Roberts. Saucer argues his conviction for the Roberts murder is not supported by substantial evidence because the verdict was based on "the uncorroborated testimony" of C.P.M., whose "credibility was flawed beyond repair." (Boldface and capitalization omitted.) According to Saucer, C.P.M.'s testimony was "the only direct evidence implicating" him in the Roberts homicide.

In evaluating a sufficiency of the evidence claim, we ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) The trier of fact "must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard," but "our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [fact finder]'s verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a

single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

C.P.M. testified that Saucer told her he directed Timmons to shoot Roberts because he believed Roberts had witnessed the Mascarenas shooting. On appeal, Saucer argues C.P.M.'s testimony does not provide substantial evidence because she was a drug addict with memory problems. Saucer claims his conviction should be reversed because C.P.M.'s testimony was "simply unbelievable" given inconsistencies in her testimony, her bias against him, and her remuneration for her cooperation. These arguments are unconvincing.

First, it was " 'the exclusive province of the [jury]" in this case to determine C.P.M.'s credibility; on appeal, we do not reweigh credibility issues or resolve evidentiary conflicts. (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) " '[E]ven testimony [that] is subject to justifiable suspicion do[es] not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness.' " (*Ibid.*) That Saucer would have confided in his then-girlfriend was not inherently improbable. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) Also, there was nothing in C.P.M.'s statements and testimony about what Saucer told her that suggested the manner in which Roberts was killed was physically impossible. (*Ibid.*)

Second, Saucer corroborated C.P.M.'s description of the Roberts murder during his police interviews, and Saucer's description was consistent with the surveillance footage of Roberts. "It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense . . . are relevant to determining whether a defendant aided and abetted in the commission of the crime." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.) However, "[m]ere presence at the

scene of a crime is not sufficient to constitute aiding and abetting." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529.)

Third, there was also circumstantial evidence of motive for Saucer's involvement. There is evidence that Roberts resembled J.C.—an eyewitness to the Mascarenas murder—whom Saucer might have benefited from having eliminated. (See *People v. Brooks*, *supra*, 3 Cal.5th at p. 57 [substantial evidence includes reasonable inferences drawn from circumstantial evidence].)

For all of these reasons, and viewed in the light most favorable to the judgment, there was sufficient evidence that Saucer aided and abetted Timmons in killing Roberts.

## VI.

### Correction to The Abstract of Judgment

The abstract of judgment incorrectly indicates Saucer was sentenced under the Three Strikes law. (§§ 667, subd. (b)(i), 1170.12.) We direct the clerk of the superior court to correct this clerical error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

### DISPOSITION

The judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment by unchecking the box that Saucer was sentenced under the Three Strikes law. (§§ 667, subd. (b)(i), 1170.12.) The clerk is further directed to forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

                                        TUCHER, P. J.

WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

*People v. Saucer* (A167793)